# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL CASE NO. |
| v. | 1:14-CR-0076-TCB-JFK |
| MARK BERKLEY COLEMAN, | |
| Defendant. | |

## REPORT AND RECOMMENDATION

Pending before the court is Defendant Mark Coleman's motion [Doc. 22] to suppress evidence and motion [Doc. 23] to suppress statements. An evidentiary hearing was held on the motions to suppress on May 7, 2014. [Doc. 27].[1] In his post-hearing brief in support of the motions to suppress, Defendant contends that the statements he made on July 28, 2010, were involuntary[2] and that his consent to seize and search his

---

[1] Citations to the transcript of the hearing are: (Tr. at ).

[2] Defendant apparently does not contend, after the evidentiary hearing, that he was in custody at the time he made these statements such that Miranda warnings were required. [Doc. 30 at 6-9]. The Government's brief in response, however, solely focuses on the issue of whether Defendant was in custody requiring Miranda warnings. [Doc. 32 at 6-12]. The court does not intend to address this issue, as voluntariness not custody is the basis upon which Defendant seeks to suppress his statement. Defendant has also withdrawn his challenge to the admissibility of statements made on March 18, 2014. [Doc. 30 at 1 n.1].

computer was not voluntary. [Doc. 30 at 4-6]. The Government opposes the motions to suppress. [Doc. 32].

## Motions to Suppress

As noted, Defendant contends that the statements he made and the consent that he gave on July 28, 2010, were involuntary. [Doc. 30]. After consideration of the totality of the circumstances surrounding his statements and consent, the court recommends denying the motions to suppress.

**I.    Facts**

Special Agents with the Federal Bureau of Investigation ("FBI") received information regarding the distribution of child pornography by the user of a computer with an IP address that the agents linked to a single-family residence located in Duluth, Georgia. (Tr. at 3-5). Based on the investigation conducted by the FBI, agents were aware that more than one person resided at the address connected to the IP address. They hoped to determine the user of the email account associated with the IP address and to seize any illicit child pornography located in the residence. (Tr. at 5).

On July 28, 2010, at approximately 2:15 p.m., FBI Special Agent Keith Kabrhel,[3] accompanied by Task Force Officer ("TFO") Heather Kish, a Duluth Police Officer

---

[3]Agent Kabrhel has been an FBI agent for eight years.

assigned to the FBI, traveled to the residence and knocked on the front door. (Tr. at 4-6). Agent Kabrhel was attired in casual clothing, with his service weapon concealed under his clothing. (Tr. at 5). The TFO was also in casual clothing but her weapon was visible holstered at her waist. (Tr. at 6). Neither weapon was drawn during the events occurring on July 28, 2010. (Tr. at 5-6).

Defendant Coleman answered the door, and Agent Kabrhel and TFO Kish displayed their credentials and identified themselves as with the FBI. The agent advised that he had some questions for Defendant. (Tr. at 6). Defendant invited them inside and stated that his girlfriend was asleep in the front bedroom. When asked if the agents could talk with him, Defendant agreed and led them to the kitchen at the rear of the residence. (Tr. at 6-7). Defendant and the agents sat at the kitchen table. (Tr. at 7). Defendant was visibly shaking and appeared nervous. (Tr. at 9, 26). Agent Kabrhel began the interview by asking Defendant demographic and background information, which included obtaining Defendant's email accounts - one of which was the email account associated with the IP address of interest to the FBI. (Tr. at 8-9, 27).

Defendant was cooperative, and the agents used a conversational tone. (Tr. at 9). The agents did not handcuff Defendant or otherwise restrain him. Because the agents did not take Defendant into custody that day, they did not advise him of his

3

Miranda rights. (Tr. at 10). Defendant did not appear to be on medication or under the influence of drugs or alcohol or to have any mental difficulties. (Tr. at 16-17). Defendant admitted using the email account to transport child pornography. (Tr. at 11). Agent Kabrhel asked Defendant for consent to seize any computers containing illicit child pornography. Defendant consented. (Tr. at 11).

In order to complete the consent to search form, Defendant led the agents to the room in which the two computers he identified as containing child pornography were located, and Agent Kabrhel completed the consent form. (Tr. at 11, 13, 27-28; Gov't Ex. 1). The agent read the form aloud to Defendant as Defendant looked at the form, in order to be able to read silently along. (Tr. at 11-12, 28-30). The form in pertinent part states:

> I, *Mark Coleman*, have been asked by Special Agents of the Federal Bureau of Investigation (FBI) to permit a complete search by the FBI or its designees of any and all computers, any electronic and/or optical data storage and/or retrieval system or medium, and any related computer peripherals described below: . . . , which I own, possess, control, and/or have access to, for any evidence of a crime or other violation of law. . . .
>
> I have been advised of my right to refuse to consent to this search, and I give permission for this search, freely and voluntarily, and not as the result of threats or promises of any kind.

4

> I authorize those Agents to take any evidence discovered during this search, together with the medium in/on which it is stored, and any associated data, hardware, software and computer peripherals.

(Gov't Ex. 1).[4]  The agent then asked Defendant if he wanted to sign the form, and Defendant signed the form.  (Tr. at 12).  The agents did not threaten Defendant nor make him any promises.  (Tr. at 12-13, 19).

Defendant, while the agents stood waiting, disassembled the two computers containing child pornography and assisted by carrying one of the computers out of the residence and placing the computer in the FBI vehicle.  (Tr. at 13-14, 31).  At some point during the interview, Agent Kabrhel offered Defendant the opportunity to write out a statement; the choice was Defendant's.  (Tr. at 14-15, 32).  The agent did not advise Defendant that the statement could be used against him.  (Tr. at 33).  When asked by defense counsel what he expressed to Defendant about writing the statement, that is, whether he told Defendant that writing the statement might be helpful to him, Agent Kabrhel responded:

> Generally I'll tell the people that I ask to write a statement that it's their opportunity to express their feelings in their words, but I can't write their

---

[4] Defendant also signed a consent form allowing FBI agents to assume his on-line identity.  (Tr. at 17; Gov't Ex. 3).  Again, the agent read the form aloud to Defendant as he followed along; and, when asked if he wanted to sign, Defendant signed the form.  (Tr. at 17-18).

5

words down. I can write the facts and the circumstances, but it's their opportunity to tell their side of the story in their written statement. That's it.

(Tr. at 32-33). Defendant wrote a statement that he signed as witnessed by the agent. (Tr. at 15-16). During the interview, Defendant never refused to answer questions or asked to end the interview. He was very cooperative and never expressed any hesitancy. (Tr. at 17, 35). The total interview lasted approximately one and one-half hours. (Tr. at 19).

Additional facts will be set forth as necessary during discussion of the motions to suppress.

## II. Discussion

### A. Statements

Defendant contends that the statements he made to FBI Agent Kabrhel on July 28, 2010, should be suppressed because the statements were not voluntarily. [Doc. 30 at 6-9]. As noted, Defendant is not contending that he was in custody at the time the statements were made or that he should have been advised of the <u>Miranda</u> warnings. [<u>Id.</u>]. A review of the circumstances surrounding the statements, as outlined in the Government's response [Doc. 32 at 6-12], confirm that Defendant was not in custody. However, contrary to the Government's apparent argument that such a finding is

6

dispositive of the issue before the court, the court must still determine that Defendant's non-custodial statements were voluntary.

The Supreme Court has recognized "that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined. . . .'" Beckwith v. United States, 96 S. Ct. 1612, 1617 (1976) (citation omitted). Defendant contends that such "special circumstances" exist in the present case and that he was coerced into making the self-incriminating statements involuntarily. As a result, it is the court's duty "'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" Id. (quoting Davis v. North Carolina, 86 S. Ct. 1761, 1764 (1966)).

In determining whether a statement was made voluntarily, courts are to evaluate "the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation." Schneckloth v. Bustamonte, 93 S. Ct. 2041, 2047 (1973). Those cases where courts have found confessions to be involuntary "have all contained a substantial element of coercive police conduct." Colorado v. Connelly, 107 S. Ct. 515, 520 (1986). "[F]actors taken into account have included the

7

youth of the accused, . . . his lack of education, . . . or his low intelligence, . . . the lack of any advice to the accused of his constitutional rights, . . . the length of detention, . . . the repeated and prolonged nature of the questioning, . . . and the use of physical punishment such as the deprivation of food or sleep. . . ." Schneckloth, 93 S. Ct. at 2047 (citations omitted); see also Hubbard v. Haley, 317 F.3d 1245, 1253 (11th Cir. 2003) ("Among the factors we must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police"). "However, 'while [courts] have enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent. . . .'" Hubbard, 317 F.3d at 1253 (citation omitted). "'Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.'" United States v. Thompson, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (citation omitted).

In this case, Defendant points to the following facts as supporting his claim that his confession was involuntary, including, his nervousness as expressed by his visible shaking (Tr. at 9, 26), not being told his written statement could be used against him

8

but that it might be helpful to him (Tr. at 32-33), and not being advised of the purpose for the interview before he disclosed his email address (Tr. at 8-9, 27). [Doc. 30 at 6-9]. While these factors may impact consideration of the voluntariness of the confession, the totality of the circumstances simply do not support a finding that Defendant's free will was overborne by coercive law enforcement conduct.

The agents approached Defendant's residence seeking his voluntary cooperation and, after identifying themselves, asked Defendant if they could speak to him. (Tr. at 5-6). Defendant invited the agents inside, agreed to speak to them, and selected the kitchen as the place for the interview in order to avoid awakening his girlfriend sleeping in the front bedroom. (Tr. at 6-8). He was not handcuffed or otherwise restrained. (Tr. at 10). The agents did not display weapons or threaten Defendant. No promises were made to Defendant. (Tr. at 6, 12-13, 19). Agent Kabrhel testified that Defendant did not appear to have a mental impairment and did appear to understand the agents in that his responses were appropriate. (Tr. at 16-17). He did not appear to be under the influence of drugs or alcohol. (Tr. at 16).

Defendant points to the fact that he was nervous and visibly shaking as evidence of the lack of voluntariness of his consent. As the Supreme Court has recognized, "Any interview of one suspected of a crime by a police officer will have coercive

9

aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." Oregon v. Mathiason, 97 S. Ct. 711, 714 (1977). However, courts have recognized that non-custodial interviews are not nearly as "inherently coercive" as those that take place while a suspect is in custody. New York v. Quarles, 104 S. Ct. 2626, 2630 (1984); accord United States v. White, 846 F.2d 678, 689 (11th Cir. 1988) ("The same concerns do not exist when interrogation does not occur in custody."). In the present case, the non-custodial interview of Defendant was not remotely close to being sufficiently coercive as to make his self-incriminating statements involuntary. Unlike other cases where police conduct was found oppressive, here the agents did not restrain Defendant and did not use or threaten to use physical punishment. See Connelly, 107 S. Ct. at 520 n.1 (citing Mincey v. Arizona, 98 S. Ct. 2408 (1978) (defendant subjected to four hour interrogation while incapacitated and sedated in intensive-care unit); Greenwald v. Wisconsin, 88 S. Ct. 1152 (1968) (defendant, on medication, interrogated for over eighteen hours without food or sleep); Beecher v. Alabama, 88 S. Ct. 189 (1967) (police officers held gun to the head of wounded confessant to extract confession)). The agents used a conversational tone during the interview. And the interview lasted less than two hours. In addition, there is no

10

evidence that Defendant, who is an adult, is totally uneducated or of low intelligence. See Schneckloth, 93 S. Ct. at 2047.

Defendant also points to the fact that he was not told the reason for the interview before he was asked about his email addresses even though his response under the circumstances of this case was incriminatory. And Defendant points out that he was not told his written statement could be used against him. [Doc. 30 at 8-9]. Because the interview conducted on July 28, 2010, was non-custodial, the agents were not required to inform Defendant of his right to remain silent or that any information he provided could be used against him. Likewise, the agents were not required to provide Defendant with details about the nature of their investigative inquiry. See United States v. Barner, 572 F.3d 1239, 1244 (11th Cir. 2009) ("the Supreme Court has 'never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights'") (citation omitted).[5]

If Defendant's argument is interpreted as contending that the agents tricked him into providing his email address and providing a written statement, that argument

---

[5]In the context of a custodial interrogation, the Eleventh Circuit Court of Appeals further explained that a defendant "must simply be aware that he may remain silent and request a lawyer, and that his statements may be used against him." Id.

11

likewise fails under the facts of this case. "[T]he law of the Eleventh Circuit is clear, that the police's use of a trick alone will not render a confession involuntary, unless there are *other* aggravating circumstances beyond the mere use of deceptive tactics[.]" United States v. Graham, 2014 WL 2922388, at *10 (N.D. Ga. June 27, 2014) (quoting United States v. Castaneda-Castaneda, 729 F.2d 1360, 1363 (11th Cir. 1984)) (internal quotation marks omitted; emphasis in original). "Indeed, '[c]onfessions are not generally rendered inadmissible merely because they are obtained by fraud, deception, or trickery practiced upon the accused, provided the means employed are not calculated to procure an untrue statement and the confession is otherwise freely and voluntarily made.'" Id. (quoting Moore v. Hopper, 389 F. Supp. 931, 934 (M.D. Ga. 1974)). Nothing about the circumstances of the interview on July 28, 2010, evidences any attempt by the agents to coerce Defendant, and there are no aggravating facts suggesting that Defendant provided the information about his email accounts and transfer of child pornography unwillingly.

Defendant alleges that Agent Kabrhel's statements implied to Defendant that providing a written statement would somehow help Defendant and, accordingly, that he misled Defendant. [Doc. 30 at 8-9]. This allegation is not borne out by the

12

evidentiary hearing transcript. Although defense counsel repeatedly tried to obtain such an admission from Agent Kabrhel (Tr. at 32-33), he only stated:

> Generally I'll tell the people that I ask to write a statement that it's their opportunity to express their feelings in their words, but I can't write their words down. I can write the facts and the circumstances, but it's their opportunity to tell their side of the story in their written statement. That's it.

(Tr. at 33). The agent's testimony does not support Defendant's argument. Defendant's statements, both oral and written, were voluntary.

For the foregoing reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 23] to suppress statements be **DENIED**.

### B.   Consent

Defendant likewise contends that the consent to search two of his computers was involuntary.[6] [Doc. 30 at 4-6]. Defendant relies on the facts that he was nervous and shaking, "affected by [the agents'] unannounced presence," to contend that his consent was involuntary. [Id.]. The Government opposes the motion to suppress arguing that Defendant's consent was in fact voluntary. [Doc. 32 at 12-14].

---

[6]Defendant did not specifically challenge the consent to assume on-line identity that he also signed on July 28, 2010. [Doc. 30; Gov't Ex. 3]. However, the same analysis would apply to that consent as the court applies to the consent to seize and search the two computers.

13

"It has been long recognized that police officers, possessing neither reasonable suspicion nor probable cause, may nonetheless search [a computer] without a warrant so long as they first obtain the voluntary consent [for the search]." United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989) (citing Schneckloth, 93 S. Ct. 2041); accord United States v. DeJesus, 435 Fed. Appx. 895, 901 (11th Cir. 2011) (same). "Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances." Id. at 798 (citing Schneckloth, 93 S. Ct. at 2059); see also United States v. Nuyens, 17 F. Supp. 2d 1303, 1306 (M.D. Fla. 1998) ("Voluntariness of consent is a question of fact, and the Court must look to the totality of the circumstances."). "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." Blake, 888 F.2d at 798 (citing United States v. Massell, 823 F.2d 1503, 1507 (11th Cir. 1987)); see also United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001) ("A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'") (citation omitted).

As the Eleventh Circuit Court of Appeals affirmed in United States v. Acosta, 363 F.3d 1141 (11th Cir. 2004), "determining whether consent was 'voluntary is not

14

susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis.'" Id. at 1151 (quoting Blake, 888 F.2d at 798). In conducting this case-by-case analysis, factors considered by courts in assessing voluntariness include, but are not limited to: "'voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.'" Blake, 888 F.2d at 798 (citations omitted); see also Purcell, 236 F.3d at 1281 (same).

However, "the government need not establish [a defendant's] knowledge of the right to refuse consent 'as the *sine qua non* of effective consent.'" United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting Ohio v. Robinette, 117 S. Ct. 417, 421 (1996)); accord United States v. Brown, 223 Fed. Appx. 875, 880 (11th Cir. 2007) ("the government is not required to prove that the defendant knew he had the right to refuse consent, and a defendant's lack of knowledge of this right is not dispositive, but is just one factor to consider in evaluating the totality of the circumstances"); United States v. Pineiro, 389 F.3d 1359, 1366 n.4 (11th Cir. 2005) ("To the extent Pineiro suggests that the police were required to be more specific in

15

advising him of his rights, and were required to tell him he had a right to refuse consent, this Court has squarely rejected this argument."). And, contrasting the test for the waiver of "rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment[,]" Schneckloth, 93 S. Ct. at 2055, the Supreme Court explained that, while a consent to search must be voluntary, it need not be "'an intentional relinquishment or abandonment of a known right or privilege[,]'" that is, knowing and intelligent. Id. at 2055-56 (citation omitted); see also Tukes v. Dugger, 911 F.2d 508, 516 (11th Cir. 1990) (same). "'[T]he absence of intimidation, threats, abuse (physical or psychological), or other coercion is a circumstance weighing in favor of up-holding what appears to be a voluntary consent.'" United States v. Alim, 256 Fed. Appx. 236, 239 (11th Cir. 2007) (quoting United States v. Jones, 475 F.2d 723, 730 (5th Cir. 1973)).

The totality of the circumstances support a finding that Defendant's consent was voluntary. As already noted, Defendant was not in custody and was not restrained during his interview with the agents. (Tr. at 10). The agents did not display weapons, did not threaten him and did not make him any promises. (Tr. at 5-6, 12-13. 19). The agents advised Defendant that they were seeking his cooperation and that he could refuse to consent. (Tr. at 12, 29; Gov't Ex. 3). At the time of the consent, he knew about the nature of the agents' investigation and that they believed he had downloaded

16

child pornography on his computer. (Tr. at 9-11). And Agent Kabrhel testified that Defendant did not appear to have any mental impairment and was not under the influence of drugs or alcohol and that Defendant did appear to understand the agents. (Tr. at 16-17). The mere fact that Defendant did not expect the agents to arrive at his residence to interview him, resulting in his nervousness and shaking, simply is not sufficient to support a finding that his consent was involuntary.

Additionally, the agents presented to Defendant a consent to search form for his computers. (Tr. at 11-12, 27-28; Gov't Ex. 1). The consent form, in pertinent part, stated that Defendant had been asked by the agents to permit a search of the identified computers, that Defendant had "been advised of [his] right to refuse to consent to this search," that Defendant gave his "permission for this search, freely and voluntarily, and not as the result of threats or promises of any kind[,]" and that Defendant authorized the agents to seize any evidence found during the search. (Gov't Ex. 1). The agent read the form aloud to Defendant as Defendant looked at the form, that is, was able to read along silently. (Tr. at 12, 28). Agent Kabrhel then asked Defendant if he wanted to sign the form, and Defendant signed the form. (Tr. at 12; Gov't Ex. 1). Defendant cooperated with the agents by disassembling the computers and carrying one of the computers outside to place in the agent's vehicle. (Tr. at 13-14, 31).

17

The totality of the circumstances, including, that Defendant was not in custody or otherwise restrained, that no physical force was used, that no threats or promises were made, that Defendant was advised he could refuse consent, that Defendant was fully cooperative with the agents, and that Defendant executed the consent to search form, establish that Defendant's consent was voluntary. See, e.g., United States v. Duncan, 356 Fed. Appx. 250, 252-53 (11th Cir. 2009) (consent voluntary under circumstances that the defendant, after answering door and being advised of a complaint of drug dealing in his residence, denied such activity, then, absent any threats, signed consent to search form); United States v. Baker, 206 Fed. Appx. 928, 930 (11th Cir. 2006) (consent to search home voluntary when the defendant signed a consent form at his residence where he was not being detained and no other threatening circumstances existed); United States v. Butler, 102 F.3d 1191, 1197-98 (11th Cir. 1997) (consent to search found voluntary when the defendant answered the agents' knock at door, was told she could refuse consent, was cooperative and signed consent form).

For these reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 22] to suppress evidence be **DENIED**.

## Conclusion

AO 72A
(Rev.8/82)

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motions [Docs. 22 and 23] to suppress be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**IT IS SO RECOMMENDED AND ORDERED**, this 11th day of August, 2014.

_____
JANET F. KING
UNITED STATES MAGISTRATE JUDGE